[No. A037375. First Dist., Div. Four. Oct. 19, 1987.]

DONALD G. KYLES, SR., Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD, CITY AND
COUNTY OF SAN FRANCISCO et al., Respondents.

COUNSEL

Barry J. Williams and Airola, Williams & Dietrich for Petitioner.

Louise H. Renne, City Attorney, Susan Daly Commins, Deputy City Attorney, and William B. Donohoe for Respondents.

OPINION

**CHANNELL, J.**—This matter has been transferred to this court by the Supreme Court, with directions to issue a writ of review. We have complied with the directive, and we now remand the matter to the Workers' Compensation Appeals Board (hereafter Board).

Petitioner Donald G. Kyles, Sr., a 43-year-old electrical transit mechanic employed by respondent City and County of San Francisco (hereafter City) for 23 years, claimed injury to his skin, gastrointestinal tract and other organs from cumulative exposure to polychlorinated biphenyls (PCB's) in the course of his employment. In denying benefits, the workers' compensation judge reasoned that because petitioner had shown neither disability nor the need for medical treatment, the PCB exposure had not caused a compensable industrial injury. In denying reconsideration, the Board adopted the judge's report. We have concluded that the medical report upon which the Board relied does not constitute substantial evidence in support of the Board's decision.

Petitioner testified without contradiction that he had been exposed to PCB oils almost daily during a period from 1974 to 1983 when his duties as an emergency repairman required him to change and repair capacitors on the tops of the City's fleet of 345 trolley buses. When the capacitors would swell and break, an oily substance was released which would spill over the tops of the buses. Dispatched to repair the capacitors, petitioner would have to climb onto the roof, replace the capacitors, and wipe up the oily substance with a shop rag, using his bare hands. Unaware of the hazards of PCB's, petitioner used no protective devices or clothing. He sometimes carried a bottle of liquid soap to wash his hands, but the oil would remain on his clothing. It was not until 1983, after a publicized explosion of a transformer on Market Street, that City ordered the capacitors removed from buses and petitioner learned of the health hazards of exposure to PCB's.

Thereafter, petitioner was referred to the Occupational Health Clinic at the San Francisco General Hospital. Petitioner was originally evaluated by

Leslie Ray, NP, assistant professor, school of nursing, University of California at San Francisco, on June 16, 1983, with a followup on June 30, 1983. Petitioner gave a history of exposure to PCB capacitor oil on his hands, knees, and forearms when he climbed up and worked on tops of trolleys. Petitioner related an onset in 1982 of dry skin and constipation. A history of elevated liver enzymes was also noted, and a repeat liver function test was scheduled and past medical records were requested.

On September 16, 1983, and again on October 28, 1983, petitioner was evaluated by Dr. Cone, the chief of the Occupational Health Clinic. Petitioner continued to have symptoms of dry skin, constipation, and right upper quadrant abdominal discomfort, as well as neck pain, a residual of a prior industrial neck and shoulder injury which was being treated by his local physician. Dr. Cone considered performing a serum PCB level, but decided to defer this test "due to the remoteness of the exposure." It was Dr. Cone's opinion at that time that petitioner's history of elevated liver enzymes was possibly related to prior PCB exposure but that "these had resolved."

On April 4, 1984, at the time petitioner filed his application for adjudication in which he sought benefits for injury caused by his exposure to PCB's, there appeared to be no link between petitioner's exposure to PCB's and his failure to recover from a prior industrial injury to his cervical spine, incurred on January 6, 1979, while he was lifting a tow bar weighing over a hundred pounds.

Petitioner's neck pain, a residual of the prior industrial injury, for which he was being treated by Dr. Barber, continued to worsen. In his report of March 13, 1984, Dr. Barber, an orthopedist treating petitioner for his orthopedic injury, was puzzled as to the reasons for petitioner's ongoing symptoms.

Petitioner was referred to Dr. Levin, a specialist in immunology, in June of 1984 for treatment of chronic arthritis and hepatitis. On September 14, 1984, Dr. Barber reported that Dr. Levin had confirmed to him that the recalcitrant pain in petitioner's neck and right elbow was "related to the PCB-induced hepatitis," and that petitioner could no longer perform his duties because of persistent swelling about his lateral humeral epicondyle which would not respond to injections or anti-inflammatory medication.

In July of 1985, Dr. Levin reported that he had been following petitioner for a year for chronic arthritis and liver involvement, reporting: "These disease processes are directly associated with long term exposures to polychlorinated biphenyl compounds (PCBs) which have been acquired during

his work on the San Francisco Muni. Mr. Kyles will be undergoing a detoxification program and we hope he will be able to recover."

Dr. Levin referred petitioner to Dr. Root of the HealthMed Clinic in Sacramento. On July 16, 1985, Dr. Root evaluated petitioner. Dr. Root noted petitioner's heavy exposure to PCB-containing oils with significant neurological symptoms, chemical sensitivity probably related to the exposure, cervical degenerative arthritis with radiating pain to the shoulders, weakness of the shoulder abductors and paresthesias particularly down the left arm, allergic rhinitis with abnormal IGE determination, possibly related to the PCB exposure, and abnormal liver function tests. Dr. Root strongly recommended that petitioner undergo the Hubbard treatment program as follows: "Mr. Kyles has had a significant exposure to polychlorinated biphenyls and these may account for many of his neurological symptoms. It is conceivable that his immune system has been effected [sic] to the point that he is not healed from his injury to the neck in a normal fashion. The Hubbard treatment program will lower the body burden of PCB's and will markedly improve his neurological symptoms and may well improve his immune system to the point that the inflammatory symptomatology related to his neck and shoulders may also be improved significantly."

City refused to provide the Hubbard treatment and instead referred petitioner to Dr. Cone. Dr. Cone evaluated petitioner again on August 15, 1985.

Dr. Cone reported that petitioner's current symptoms included neck and head pain radiating to the shoulder blades and shoulders, worsening over the past two years, with noted difficulty straightening of his arms at times, skin dryness which persisted, pain in the lower abdomen, increased constipation, loss of memory, increased sensitivity to perfumes and gasoline, decreased vision in his right eye, a rash when he showered, increased fatigue, and weakness in his upper arms, making it difficult for him to lift objects without pain or hold his arms above his shoulders. Dr. Cone noted that petitioner had been unable to work since September of 1984.

Dr. Cone reviewed medical reports of Dr. Root and Dr. Levin through July of 1985, but not the reports of petitioner's orthopedist, Dr. Barber, and on November 22, 1985, issued the report relied upon by the judge to find that petitioner had suffered neither disability nor the need for medical treatment by reason of his PCB exposure.

Dr. Cone found evidence of episodic elevation of liver enzymes, which he attributed in part to PCB exposure and in part to intermittent alcohol intake. He also noted that chronic treatment with Feldene, an anti-

inflammatory medication prescribed for use by petitioner, could cause mild chemical hepatitis and might be responsible for the recent elevations in liver enzymes. Dr. Cone concluded that although the injury to petitioner's head and shoulders had worsened in the past two years and that petitioner was disabled from his previous work, it was unlikely that the PCB exposure had "any significant effect on this problem." Dr. Cone stated his opinion that "any removal of PCB's by performance of a combination of exercise, saunas, diet, and minerals, even if effective (evidence from the literature on this method indicated that a 30-40 percent reduction in fat PCB levels may be seen by such techniques), would not be likely to significantly improve the arm and neck symptoms." With respect to need for medical treatment, Dr. Cone recommended that petitioner receive treatment consisting of physical therapy and anti-inflammatory medication, that he should avoid medication which would exacerbate his hepatic condition, and that he should be afforded vocational rehabilitation and avoid exposure to hepatoxins. Dr. Cone also indicated that petitioner would need surveillance on an annual basis for his history of asbestos exposure. Dr. Cone also recommended neuropsychological evaluations of complaints of memory loss and other neuropsychological symptoms, and stated that petitioner might benefit from psychological counselling. Dr. Cone concluded with the statement: "No indication exists at present, in my opinion, for treatment with the Hubbard method."

In denying benefits, the judge relied upon the medical opinion of Dr. Cone, concluding that "although there may have been PCB exposure, that has not resulted in any present disability or need for medical treatment."

■ Compensation may be awarded under the Workers' Compensation Act for any injury or disease arising out of and in the course of employment. (Lab. Code, §§ 3208, 3600; *J. T. Thorp, Inc.* v. *Worker's Comp. Appeals Bd.* (1984) 153 Cal.App.3d 327, 332 [200 Cal.Rptr. 219].)[1] Labor Code section 3208.1[2] provides: "An injury may be either: (a) 'specific,' occurring as the result of one incident or exposure which causes disability or need for medical treatment; or (b) 'cumulative,' occurring as repetitive mentally or physically traumatic activities extending over a period of time, the combined effect of which causes any disability *or* need for medical treatment." (Italics added.)

■ A compensable injury may render the employer liable for, among other things, the cost of medical treatment. (*J. T. Thorp, Inc., supra,* 153

---

[1] " 'Injury' includes any injury or disease arising out of the employment, including injuries to artificial members, dentures, hearing aids, eyeglasses and medical braces of all types; provided, however, that eyeglasses and hearing aids will not be replaced, repaired, or otherwise compensated for, unless injury to them is incident to an injury causing disability." (Lab. Code, § 3208.)

[2] All further statutory references are to the Labor Code.

Cal.App.3d at p. 333.) Employer liability for medical treatment is provided by section 4600. Section 4600 provides: "Medical, surgical . . . and hospital treatment . . . which is reasonably required to cure or relieve from the effects of the injury shall be provided by the employer."

While medical expenses, in order to be compensable, must be reasonably necessary to cure or relieve from the effects of an industrial injury, the statutes do not require any finding of disability, temporary or permanent, as a condition to such recovery. (*Braewood Convalescent Hospital* v. *Workers' Comp. Appeals Bd.* (1983) 34 Cal.3d 159, 166 [193 Cal.Rptr. 157, 666 P.2d 14]; *Cedillo* v. *Workmen's Comp. Appeals Bd.* (1971) 5 Cal.3d 450, 454 [96 Cal.Rptr. 471, 487 P.2d 1039]; *J. T. Thorp, Inc., supra,* 153 Cal.App.3d at p. 333.)

 The evidence that petitioner was exposed to PCB's during the course of his employment is not disputed. Petitioner so testified; and inasmuch as none of his testimony has been contradicted or impeached, we accept as true the import of such evidence. (*Braewood Convalescent Hospital, supra,* 34 Cal.3d at p. 167.)

In his report of November 22, 1985, Dr. Cone described polychlorinated biphenyls and their effect upon humans.[3] The medical reports, including those of Dr. Cone, document that petitioner suffers from many of the potential health effects reported to result from exposure to PCB's. Petitioner's symptoms include dry skin, abnormal liver function tests, clinical hepatitis, elevated triglycerides and elevated liver enzymes. Drs. Levin and Barber insist that the detoxification treatment recommended by Dr. Root is necessary to halt or reverse petitioner's hepatic involvement and the progressive stiffening of his cervical and long-bone joints.

Here the Board rejected the medical opinions of Drs. Barber and Levin, petitioner's treating physicians, and that of Dr. Root, and accepted the

---

[3] As described by Dr. Cone, "Polychlorinated Biphenyls are a family of chemicals with various numbers and positions of chlorine atoms attached to a biphenyl nucleus. They were often used in the past due to their dielectric properties, in transformers and capacitors such as found on the MUNI electric trolly buses. Their use has been restricted since 1977 by EPA, and their use in even closed systems such as transformers recently banned by EPA due to their persistence in the environment and potential health effects. [¶] Chronic effects in humans reported include skin effects (primarily chloracne, a cystic, yellow acne-like lesion seen on the face and arms), effects on the liver (including abnormal liver function tests and clinical hepatitis, and elevated triglycerides), reproduction (in patients exposed to rice oil contaminated with PCB's and dibenzofurans), and a number of biochemical abnormalities, including enzyme induction and porphyria. Cancer has been noted in animal[s]. Effects on the immune system have been correlated with the effects on aryl hydrocarbon hydroxylase, an enzyme, and include immunosuppression, particularly of B-cell responses and antibody production, and Natural Killer Cells, which are hypothesized to be responsible for immune surveillance for cancer."

medical opinion of Dr. Cone, who reported for City. ▆▆ It is well settled, of course, that the Board may choose between conflicting medical opinions, and that the relevant and considered opinion of one physician, although inconsistent with other medical opinions, may constitute substantial evidence in support of a decision of the Board. (*Braewood Convalescent Hospital, supra,* 34 Cal.3d 159, 169.) Expert medical opinion, however, does not always constitute substantial evidence on which the Board may rest its decision. The Board may not rely on medical reports which it knows to be erroneous, upon reports which are no longer germane, or upon reports based upon inadequate medical history or examinations. (*Place v. Workmen's Comp. App. Bd.* (1970) 3 Cal.3d 372, 378 [90 Cal.Rptr. 424, 475 P.2d 656]; *Zemke v. Workmen's Comp. App. Bd.* (1968) 68 Cal.2d 794, 798 [69 Cal.Rptr. 88, 441 P.2d 928].) A medical report which lacks a relevant factual basis cannot rise to a higher level than its own inadequate premises. Such reports do not constitute substantial evidence to support a denial of benefits. (*Zemke, supra,* at p. 801.)

▆▆ Dr. Cone's report reveals that although he reviewed the medical reports of Dr. Levin through July of 1985 and the medical report of Dr. Root, he did not have before him numerous medical reports submitted by Dr. Barber, petitioner's treating orthopedist. That Dr. Cone was not provided copies of Dr. Barber's reports is borne out by his outlining of the records he had reviewed and his statement, "His prognosis of recovery from his condition would be best addressed by an orthopedist who has had experience with such musculoskeletal conditions."

Dr. Barber, who had been consulting with Dr. Levin, has repeatedly stated his opinion that the myofascitis of petitioner's cervical spine and the epicondylitis of petitioner's right lateral humerus were PCB induced, and in a report dated October 31, 1985, he warned that in the absence of a detoxification program, petitioner would develop a "fixed flexion contracture of the spine, i.e., a situation where he will only be able to look at his feet."

Dr. Cone's statement that the Hubbard treatment "would not be likely to significantly improve the arm and neck symptoms," made in the absence of a review of all of the medical records, particularly those of petitioner's treating orthopedist, cannot be accepted as substantial evidence. Nor does his opinion, limited as it is to arm and neck symptoms, constitute substantial evidence that petitioner does not need medical treatment to cure or relieve from the effects of the medically ascertainable injury to petitioner's immune system, clinically demonstrated by findings of elevated liver enzymes and triglycerides and chemical hepatitis, which Dr. Cone admits has "most likely" been caused by cumulative PCB exposure.

Petitioner's claim for cumulative injury to his immune system is separate and distinct from his prior claim for specific injury to his neck and shoulder. Although the Hubbard treatment is controversial, Dr. Cone admits that the treatment will produce a 30 to 40 percent reduction in fat PCB levels. Drs. Barber, Levin, and Root believe that the detoxification program will improve petitioner's immune system *and* will also reduce his neck and shoulder symptoms. In either case, the treatment aimed at affording relief from an industrial injury represents a compensable expense under section 4600.

The Board's order of November 24, 1986, is annulled, and the matter is remanded to the Board for further proceedings consistent with this opinion. Petitioner shall recover his costs.

Anderson, P. J., and Poché, J., concurred.