Filed 2/1/21  Rodriguez v. Board of Retirement of Fresno etc. CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| ANDRES RODRIGUEZ, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> BOARD OF RETIREMENT OF FRESNO COUNTY EMPLOYEES' RETIREMENT ASSOCIATION, <br><br> Defendant and Appellant. | F078785 <br><br> (Super. Ct. No. 17CECG01497) <br><br> **OPINION** |

APPEAL from an order judgment of the Superior Court of Fresno County. Rosemary T. McGuire, Judge.

Baker Manock &  Jensen, Peter G. Fashing and Craig W. Armstrong for Defendant and Appellant.

Thomas J. Tusan for Plaintiff and Respondent.

-ooOoo-

The Board of Retirement of Fresno County Employees' Retirement Association (Board) denied Andres Rodriguez's application for a service-connected disability retirement.  Rodriguez filed a petition for writ of mandate to set aside the Board's determination.  The trial court granted the writ and directed the Board to grant Rodriguez a service-connected disability retirement.  The Board appeals, arguing:  (1) the trial court

did not correctly apply the independent judgment standard of review because it did not presume the correctness of the administrative findings; (2) even if the standard was correctly applied, the trial court's findings are not supported by substantial evidence; and (3) the trial court exceeded its jurisdiction when it ordered the Board to grant Rodriguez's application. Finding no merit to the Board's contentions, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Rodriguez began work for the County of Fresno (County) in September 1992 as an extra help employee. In January 1994, he became an office assistant in the County's Health Services Agency, when he enrolled in the Fresno County Employee Retirement Association (FCERA). Thereafter, Rodriguez continued to work for the County and eventually became a senior child support officer in the County's Department of Child Support Services (DCSS).[1]

### The October 4, 2009 Incident and Its Aftermath

Rodriguez, who was having an extra-marital affair with a coworker (Jane Doe), broke off the relationship in October 2009, after Jane Doe disclosed the affair to his wife.[2] On October 4, 2009, Jane Doe became angry and threw her keys and cellphone at Rodriguez during a work break, creating a scene. She also played Rodriguez's voicemail messages about the breakup to coworkers over a speakerphone. Rodriguez testified he brought the matter to management's attention as he felt it was going to interfere with his work, and he asked management to restrict Jane Doe from coming around him. Management complied with his request.

---

[1] A senior child support officer is a lead position on a team and works directly below a supervisor. In the supervisor's absence, the senior child support officer works in the supervisor's capacity to assist with workflow, help with training, review child support cases for quality assurance, and ensure the error rate is accurate and consistent within the team and within an acceptable rate. The senior child support officer also works on the more difficult cases in a lead capacity.

[2] While Jane Doe was Rodriguez's subordinate, they were on different teams. DCSS does not generally prohibit fraternization between employees.

DCSS Director Kari Gilbert first became aware of the affair when Jane Doe and Rodriguez separately reported the incident to management. Gilbert spoke with Rodriguez, who told her he wanted Jane Doe to leave him alone and management to keep her away from him, as he and his wife were trying to work things out and the affair was over. Gilbert told Rodriguez she would tell Jane Doe to stay away from him, but he needed to avoid her as well. Gilbert then told Jane Doe she was not to be around Rodriguez, and she was given a reprimand. The two were instructed to stay away from each other. Gilbert offered each of them a day off because they were upset. Rodriguez took several days of annual and sick leave, and he provided a doctor's note advising he could return to work on October 21, 2009.

Rodriguez testified the relationship with his wife was "tense" and created stress. In November 2009, the couple participated in one family therapy session with marriage and family therapist William Volkoff. Volkoff noted the couple's complaints stemmed from the affair. Rodriguez reported symptoms of guilt and he was anxious or nervous. Rodriguez wanted the relationship with his wife to work and for his wife to trust him. The therapist diagnosed Rodriguez with anxiety disorder and advised him of the need for consistent appointments. Rodriguez, however, was uncertain about continuing therapy and did not return.

Rodriguez believed the fraternization restriction was lifted, but he did not remember when or whether he asked for that; he also did not remember socializing with Jane Doe while the restriction was in place. According to Gilbert, a day or two after the incident, Rodriguez told her he did not understand why she was keeping him and Jane Doe away from each other. Gilbert did not lift the restriction and explained they were not to be around each other during the workday.

Gilbert, however, lifted the restriction after two or three months because it had become complicated to keep the two apart, as they were seen together outside the workplace during lunches and breaks and talking inside the building. Before she lifted

3.

the restriction, she asked Rodriguez how things were going, and he said they were perfectly fine. Gilbert spoke to Rodriguez and Jane Doe separately; she told them to work when they were at work, she trusted them to be professional, and to let her know if there was a problem. When the restriction was in place, Rodriguez did not complain to management about Jane Doe harassing or bothering him.

Rodriguez's supervisor, Michelle Sanabria, went on leave in March 2010 and another supervisor helped co-supervise Rodriguez's team. During that time, Rodriguez did not complain about Jane Doe. The day Sanabria returned from her leave in mid-May 2010, a staff member advised her that during the entire time Sanabria was gone, Jane Doe was at Rodriguez's desk on a daily basis engaging in personal conversations for extended periods of time, which created an uncomfortable situation for other employees and made him inaccessible to the team. A probationary employee who Rodriguez was training was nearly in tears because she had to pass by Rodriguez's workstation to get to her desk; she "felt trapped" when Jane Doe was there due to their personal conversations and was afraid to say anything when Sanabria was gone because Rodriguez had "input on her evaluations and her work review." On Sanabria's return to work, Rodriguez did not express any concern to her regarding Jane Doe disrupting his work.

At some point Sanabria's supervisor, Annette Coke, spoke to Rodriguez about Jane Doe coming to his desk and told him "you need to tell her that you're working and she needs to leave." Sometime after Sanabria's return, Coke and Gilbert together spoke to Rodriguez, who said, "Well, I tried to tell her, but she won't go away."

Toward the end of May 2010, Rodriguez approached Gilbert and Coke about voicemails Jane Doe left on his work phone, which he played for them. On the voicemails, Jane Doe was "very upset" with Rodriguez; she was derogatory, belligerent and hostile. Rodriguez was told Jane Doe would be placed on administrative leave while they investigated, although Rodriguez did not ask for that. Rodriguez was given the rest of the day off and since they were going into a three-day weekend, Gilbert gave him her

4.

personal cell phone number so he could call if there were any issues. Jane Doe was placed on administrative leave.

An investigation into the voicemails followed. Gilbert asked the County's IT department to capture the voicemails, but someone dialed into Rodriguez's password-protected work phone from an outside phone and deleted the messages. Rodriguez told Gilbert he was the only one who had his password. Management already had the messages, though, as they recorded them off his phone. That weekend, Rodriguez called Gilbert on her cell phone and asked management to stop whatever actions they were taking. Before Jane Doe was placed on leave, she told Gilbert that Rodriguez had been coming to her desk during work hours and left notes telling her how he missed her. He also left her voicemails, which she played for Gilbert.

Rodriguez denied communicating with Jane Doe after she was put on administrative leave. He also denied meeting with Jane Doe during off-work hours when the restriction was in place and said he saw her a couple times during breaks or lunch at work.

Gilbert and Sanabria testified they never discussed the affair with other DCSS employees outside the realm of the restrictions and investigation, and never joked about the affair with other DCSS employees.

### Rodriguez's Work Performance and Evaluations

From 2000 through January 2008, Rodriguez was given the highest rating— "Exceeds Satisfactory"—in all categories on his annual performance evaluations.

Rodriguez began receiving "Satisfactory" ratings on his performance evaluation for the period from January 2008 to January 2009. Supervisors Thelma Delemos and Socorro Quiroz participated in the evaluation and rated him "Satisfactory" in the areas of interpersonal and professional skills, while Quiroz rated him "Satisfactory" in attendance. They rated Rodriguez "Exceeds Satisfactory" in the remaining areas and his overall

rating was "Exceeds Satisfactory."**3**  Rodriguez objected to the lower ratings, which he explained on the form next to his signature.

Rodriguez received more "Satisfactory" ratings in his performance evaluation for the period from January 2009 to January 2010.  Quiroz and Sanabria, who began supervising him in August 2009, gave Rodriguez a "Satisfactory" rating on his performance evaluation in the following areas:  responsiveness; rules, regulations and procedures; interpersonal and professional skills; and attendance.  He was rated "Exceeds Satisfactory" in three other areas and his overall evaluation was "Satisfactory."  Suggestions for improvement centered on better communication with his team.  Rodriguez disagreed with the satisfactory ratings in several areas, as well as the overall rating, and wrote a response.

In August 2010, Sanabria gave Rodriguez a counseling memo concerning his preference for communicating by email instead of in person—an issue that was brought up in connection with his last two performance evaluations—and his failure to brief Sanabria on a meeting he attended in her place.  She wanted him to improve his communication style and his failure to communicate in group meetings.  A counseling memo is not a disciplinary action, but rather it is used to advise the employee on areas in which the employee needs to improve.  Rodriguez was never issued an oral or written reprimand or disciplinary order regarding his workplace performance, and Sanabria denied ever telling him he was at risk of demotion or termination.

Rodriguez, however, complained his supervisors constantly harassed him and were nitpicky, which resulted in depression, lack of concentration and a bad memory.  He said they criticized everything he did.  While he was never given a written reprimand or disciplined, he was constantly brought in for counseling about his work performance.  He

---

**3**    A "Satisfactory" rating means the employee is meeting the expectations of the job; it is not an adverse or negative rating.  An employee who receives a satisfactory rating would be granted a step increase if the employee was entitled to one.

was told he needed to do things a certain way and when he complied, Sanabria would call him back in and say he did it wrong. Rodriguez did not understand, and he did not know what to do and felt like he could not do anything about it. Rodriguez did not tie the criticism to his issues with Jane Doe; most of it occurred after she was placed on leave. Rodriguez did not file a grievance or discrimination complaint claiming adverse treatment at work.

Gilbert and Sanabria explained the drop in Rodriguez's performance ratings at the administrative hearing. Gilbert testified that around 2008, written "Senior Expectations" were given to, and reviewed with, senior child support officers, including Rodriguez, so they would know what was expected of them. Gilbert explained they wanted senior child support officers to be utilized in a senior lead capacity instead of merely being "super caseworkers," so they could serve as their supervisor's right-hand person. Rodriguez began receiving satisfactory ratings on his performance evaluations because, while he was good at the difficult technical things, he needed to develop leadership and communication skills.

Sanabria testified when she became Rodriguez's supervisor in August 2009, she met with him for two to three hours to discuss the expectations of him as the team senior. She focused on "soft skills," such as communication, leadership, and working with team members. She told him he would not be doing technical work as much, which was for lower level staff, but rather would help participate in meetings and act in her absence. She rated Rodriguez satisfactory in his 2010 performance evaluation because he still was working on these issues and needed to improve.

After October 2009, Sanabria met with Rodriguez monthly to discuss his work and performance. When asked if she met with him two to three times a week, Sanabria responded, "[i]f necessary," because she could have impromptu meetings with a senior if there was something that needed discussion, and that could occur "two to three times a week depending on what was going on that week with the team." Ideally, she would

have a close working relationship with a senior child support officer, and it would be out of the ordinary if the officer did not meet with her multiple times a week. Sanabria talked to Rodriguez about personally communicating with others rather than emailing them and she had to bring this issue to his attention more than once; Rodriguez was either nonresponsive or did not agree. It was her role to provide constructive criticism to her subordinates; she did not believe satisfactory evaluations or ratings were criticism. Sanabria sought help from her manager with the issues she was having with Rodriguez, but he was not improving. Gilbert testified Sanabria was meeting more frequently with Rodriguez in order to work with him on the changing expectations.

***Rodriguez Takes Leave and Applies for Retirement***

Rodriguez was on medical leave for much of the month of November 2010. Rodriguez testified he stopped working because he could not deal with the criticism he was receiving; he dreaded going to work and it got to the point that he could not function. The next month, he went on an extended medical leave of absence and never returned to work. In September 2011, he applied for an unpaid leave of absence; on the form, under the reason for the request, the box labeled "Own Serious Health condition (non-work related)" was marked. In December 2011, he applied for another unpaid leave of absence. On the form, under the reason for the request, the box "On-the-job injury/illness claim" and the box "Approved" were crossed out, and the box labeled "Own Serious Health condition (non-work related)" was marked. Rodriguez believed he checked the box "On-the-job" on both forms, and said the requests were related to his stress.[4] Gilbert granted additional leave extensions until April 2012, to allow time for Rodriguez to look for another job within the County, but that was unsuccessful. Rodriguez asked to return

---

[4] Gilbert testified they do not fill out the application form for employees and do not check the boxes for them. If the form is incomplete, it is returned to the employee or the employee is asked to come in and complete it.

8.

four hours per day with only 30 minutes of customer service per day, but DCSS could not accommodate these restrictions and he was denied additional leave on May 2, 2012.

Rodriguez applied for a service-connected disability retirement in August 2012. He described his permanent disability as "stress, major depression, recurrent, hostile & retaliation work environment," and the injury occurred at his place of employment beginning on October 4, 2009, through the date of the application, due to the employer-created "stressful environment." Rodriguez had not worked at any job since he went out on leave.

### Workers' Compensation Exam by Dr. Gary D. Hatcher

In November 2010, Rodriguez applied for workers' compensation benefits and saw Qualified Medical Evaluator Gary D. Hatcher, D.O., M.P.H. Rodriguez told Dr. Hatcher he had ongoing stress due to his work environment; on October 4, 2009, he was reviewed for performance issues and subjected to some form of reprimand, and his supervisors wanted to demote him but that was not permissible under the facts of his cited poor performance. Rodriguez claimed the work event injured him and continued to do so, as he felt anxiety at work and was irritable, and he was drinking far more than he was used to. Rodriguez believed he was having a nervous breakdown, so he saw his personal physician, who took him off work, prescribed Ativan, and instructed him to file a workers' compensation claim. Rodriguez admitted to Dr. Hatcher that his employer did not violate any laws, personnel policies, or public policy in their treatment of him.

### Treating Psychiatrist Dr. Rehana Aziz

Rodriguez first saw psychiatrist Rehana Aziz, M.D., for treatment in March 2011. In December 2011, Dr. Aziz completed a physician form to support Rodriguez's request for a reasonable disability accommodation. Dr. Aziz described Rodriguez's disability as being anxious when dealing with people; in addition, he was irritable, forgetful, tired, unable to concentrate, indecisive, and angry, and he had muscle tension and poor sleep. At the time, Rodriguez's impairment was temporary, with an anticipated duration to April

2012. Dr. Aziz believed Rodriguez was unable to perform the duties of a child support officer due to his inability to concentrate for more than five minutes, anxiousness and indecisiveness.

On July 10, 2012, Dr. Aziz wrote a short letter stating her patient, Rodriguez, "no longer is able to perform essential functions of current job and unable to obtain a[n] equivalent paying position due to disability." On August 10, 2012, Dr. Aziz wrote a letter stating she evaluated Rodriguez on March 23, 2011, and his diagnosis was "Major Depression Disorder Recurrent," which "was caused by stress, hostile & retaliation in the working environment." Rodriguez was on Prozac, Seroquel and Trazadone, and he was no longer able to obtain an equivalent position due to his disability. Dr. Aziz stated the disability "greatly [a]ffected his essential functions and progress in life," and he was "permanently not able to continue the performance of his duty," although "treatment is on going at this time."

In January 2013, Dr. Aziz completed a summary of mental health records form and a questionnaire on affective disorders. Rodriguez was disabled due to major depression, recurrent, which prevented him from returning to his regular and customary work because he lacked concentration, was easily frustrated, had memory problems, and his thinking was confused. He was disabled longer than previously estimated for his type of illness as he had shown minimal improvement in his depressive symptoms. In addition, his work required interviewing people, but he felt overwhelmed and feared social situations, and his concentration should be good while performing his job. Dr. Aziz left blank the question that asked for an estimated date Rodriguez would be able to perform his regular and customary work. Dr. Aziz noted Rodriguez had used alcohol for several years.

Dr. Aziz found Rodriguez's anxiety was the "predominate disturbance" as evidenced by the following: (1) generalized persistent anxiety; (2) a persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to

10.

avoid that object, activity or situation; (3) recurrent severe panic attacks averaging at least once a week; (4) recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress; and (5) symptoms resulting in the complete inability to function independently outside the home.

Rodriguez had a documented history of a chronic affective disorder of at least two years' duration that caused more than a minimal limitation of ability to do basic work activities. He also had the following: (1) repeated episodes of decompensation of extended duration; (2) a residual disease process that resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause him to decompensate; and (3) a history of one or more year's inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. Dr. Aziz rated Rodriguez as moderately limited in the area of restrictions of activities of daily living, and markedly limited in the areas of difficulties of concentration and social functioning, deficiencies of concentration, persistence or pace, and repeated episodes of decompensation of extended duration.

***Workers' Compensation Exam by James E. House, Ph.D.***

James E. House, Ph.D., a forensic and clinical psychologist who served as the neutral Qualified Medical Examiner in Rodriguez's workers' compensation case, evaluated Rodriguez on April 14, 2011. Dr. House interviewed Rodriguez, reviewed records, and administered psychological tests.

Rodriguez told Dr. House on the reported date of injury, October 4, 2009, he ended his affair with a coworker, and she threw her phone at him at work, which he reported to Gilbert. After Gilbert asked the coworker to stay away from Rodriguez, he began having difficulty with his immediate supervisors. Rodriguez claimed his work was increasingly scrutinized with a "fine tooth comb" and there were increasing comments about his supervisory skills and administrative acumen. Rodriguez said he brought up his

concerns and issues with Sanabria, Coke, and Gilbert, and his discussions rose to the level of then director Robert Bash with little or no resolution.

Rodriguez further told Dr. House he continued to receive harassing and persistent calls from the coworker, and he was having ongoing difficulties with his wife, who discovered his infidelity. His department manager told him he "created a problem and had to deal with the stress" or look at a possible demotion or termination. The coworker continued to harass him with calls and visits to his work area, and he had asked at "all levels of management" to intervene, but he felt they refused his requests to "take care of the problem." Rodriguez said, "his supervisors and managers continued to create a stressful, hostile, retaliative [*sic*] environment," and they joked about his situation and the issue was never confidential. Rodriguez said he continued to experience ongoing depressive symptomatology, anxiety, and a degree of angst associated with his workplace issues. He felt he was subject to undue scrutiny about his supervisory style and performance, and he was unjustly characterized with having personal inadequacies and shortcomings.

Based on the evidence, Dr. House opined there appears to be a reasonable degree of medical probability Rodriguez suffered "from an Adjustment Disorder related to occupational factor," and it appeared "these issues elicited and aggravated underlying intrinsic psychological and characterological traits that were fired up by the workplace incidents and issues." There did not appear to be enough substantiating evidence to support "a direct causal relationship in the development and invoking of these symptoms and issues that would be indicative of a permanent or residual psychiatric injury that was secondary to industrial factors."

Dr. House opined Rodriguez had intrinsic and pervasive psychological issues that met the diagnostic criteria of a generalized anxiety disorder coupled with depressive disorder "that is unrelated to industrial causation." Dr. House further opined there was a high degree of medical probability Rodriguez had a longstanding history of

characterological and personality traits which directly contributed to his current psychological presentation and, coupled with his admitted history of increased alcohol use,[5] complicated his clinical presentation. While it was reasonable to assume "workplace issues" caused a "substantial degree of anxiety and distress that led to … an Adjustment Disorder," in Dr. House's opinion, "the events of employment were not the 'predominant cause' as to all causes of Mr. Rodriguez's current diagnosis and psychiatric presentation." Rodriguez's symptoms appeared to be "in excess" of what one might expect under similar circumstances, and there was not enough "substantiating evidence (greater or equal to 51%) to support a direct causal industrial relationship." Dr. House believed Rodriguez had "the functional capacity to meet his job responsibilities and duties," and it was in Rodriguez's best interest to return to the workplace in a graduated, modified work status with clearly defined jobs, responsibilities and expectations with a goal of returning to his full functional and supervisory responsibilities.

### Dr. House's Testimony

Dr. House testified about his evaluation at a retirement hearing on August 7, 2015. Rodriguez's stress did not arise to the workers' compensation legal level of 51 percent of all factors. While Dr. House appreciated Rodriguez was having adjustment problems and difficulties at work, he "was not presenting with a permanent disability … that was related to workplace difficulties"; instead, those difficulties arose from his personality and characterological elements. When asked if he would have reached the same finding under a standard that required showing a permanent disability that substantially arose out of and in the course of employment, Dr. House responded "[p]retty much so." Dr. House did not see any psychiatric acuity at that time that was of clinical concern and that rose to

---

[5] Rodriguez told Dr. House he had noticed an increase in his alcohol intake and reported he drank about 12 cans of beer two to three times a week, which was out of character for him. Rodriguez did not feel this was an excessive or abusive level of drinking.

the level of a "permanent or psychiatric disorder that was solely due to work-related issues."

Dr. House did not feel more than 50 percent of Rodriguez's stress arose from the October 2009 incident, and he believed "these were situational difficulties and work-related difficulties that did not result in a permanent psychiatric disorder." When asked if he did not think Rodriguez was permanently disabled, Dr. House responded: "Well, I agree, I believe he was having some adjustment situational difficulties, but I don't think it reached that level."

Dr. House confirmed he performed the evaluation only in the context of the workers' compensation case. In accordance with workers' compensation law, the term "substantial degree" in his report meant 35 to 40 percent, and the term "predominant cause" meant greater than or equal to 51 percent. When asked if it was his opinion the "workplace issues at least caused 35 to 40 percent" of Rodriguez's disability, Dr. House responded he could "go along with that line of thinking, yes, sir," and confirmed it did not get up to the 51 percent threshold. Dr. House agreed he never issued an opinion regarding Rodriguez's level of permanent disability or the apportionment of that disability between nonindustrial and industrial factors. When asked if the events Rodriguez told him about substantially arose out of or in the course of his employment, or were nonindustrial events, Dr. House responded: "I think they were a combination of nonindustrial events, which included his ongoing difficulties with his personal relationships coupled with direct, substantial workplace problems he was having and was under the direction of other managers to address it. I think it was a combination of both."

***Independent Medical Examination by Howard J. Glidden, Ph.D.***

The FCERA referred Rodriguez to Howard J. Glidden, Ph.D., a developmental neuropsychologist, who conducted a psychological evaluation of Rodriguez on March 15, 2013. Dr. Glidden obtained background information from interviewing Rodriquez and

14.

reviewing his medical and employment records.  Dr. Glidden also administered psychological tests.

Rodriguez told Dr. Glidden he applied for a service-connected disability "[f]or stress," but it had been a long time and he was "real forgetful" because he had not worked for two or three years.  Rodriguez explained he had an affair with someone at work, which created a problem, and after that, management started picking on him every day for close to two years.  Rodriguez said he "would go in the office and do what they say[,] and they would pull me and say[,] 'Why did you do it that way?'  They didn't write me up, but every day they would pull me[,] and I couldn't sleep, I couldn't concentrate."

Rodriguez told Dr. Glidden management was being critical of him.  When asked if the criticism was constant or escalated over time, Rodriguez responded:  "It was both worse and constant.  It just looked like they were looking for something to fire me.  Other people noticed it, about how they were treating me."  Rodriguez described his symptoms prior to the end of his employment as follows:  "I was angry and worried, just anxious and I would dread just going to work.  They would call me to the office, if not every day, two to three times a week.  There would be stuff like if I asked for a vacation[,] they would say no.  There was a lot of nit picking all the time; they would tell me to do something and then it would still be wrong."  Rodriguez said everything was good until management found out about the affair; thereafter, the stress continued for a year or a year and a half.  Rodriguez said his present symptoms were better, which was why Dr. Aziz was seeing him every three months; he had the same issue, but it was "a bit more stable."

Dr. Glidden summarized Rodriguez's claim.  Rodriguez alleged experiencing chronic and escalating work-related stress after the affair was disclosed, when his paramour began a campaign of harassment.  Rodriguez reported he received promotions and positive evaluations, which was confirmed in the records Dr. Glidden reviewed, until he sought relief by informing his supervisors about the harassment.  Thereafter,

Rodriguez felt little support and instead experienced criticism for his performance and feared for his job, which escalated over time and continued until he left employment. At his primary care doctor's direction, Rodriguez sought and received psychiatric care, which continued to date. Rodriguez reported continuing to experience significant psychologic distress which has impacted him physiologically in terms of sleep, hygiene and eating patterns; interpersonal relationships; self-esteem; and finances.

Dr. Glidden stated overall, based on the self-report, review of available records, and results of his evaluation, the findings were consistent with the diagnosis of "Major Depressive Disorder, Recurrent, Severe Without Psychotic Features, Chronic" and "Generalized Anxiety Disorder." Dr. Glidden opined Rodriguez was disabled for the performance of his job duties, as he continued "to experience psychologic/psychiatric symptomatology which are exacerbated under conditions in which he finds himself contemplating return to work in his previous setting."

Dr. Glidden further opined his incapacity was permanent, explaining: "Mr. Rodriguez is now greater than three years post initiation of stress stemming from a reported hostile work environment initiated on or around October 4, 2009. Despite psychiatric treatment to date, Mr. Rodriguez continues to experience symptoms of anxiety and depression which would make his ability to return to work untenable. In addition, on July 10, 2012, Dr. Aziz, Mr. Rodriguez' psychiatrist stated he would no longer be able to perform the functions of his current job."

Finally, Dr. Glidden opined Rodriguez's incapacity arose out of his employment. Dr. Glidden explained that despite what Dr. House reported,[6] Rodriguez's symptoms of

---

[6]     Dr. Glidden explained his disagreement with Dr. House as follows: "Dr. House alludes to 'intrinsic psychological and characterological traits'; which suggests he concluded Mr. Rodriguez has experienced a lifelong pattern of poor psychological adjustment. However, Dr. House does not provide any data/evidence which suggests Mr. Rodriguez described, was evaluated/treated for, or sought assistance for psychologic/psychiatric symptomatology prior to the subject work[-]related stressors.

anxiety and depression were not a natural progression of a preexisting disorder, and there was no competing explanation for his deficits. Dr. Glidden's opinion was based not only on Rodriguez's report, but also on his medical and personnel records. Based on consideration of all the evidence presented, Dr. Glidden concluded "the sequelae of psychiatric/psychological symptoms Mr. Rodriguez sustained during the course and scope of his employment and residual of symptomatology did arise out of employment." Accordingly, Dr. Glidden opined within a reasonable degree of psychological certainty that Rodriguez's affective symptomatology arose from employment-related circumstances.

***The Administrative Hearings and Board's Decision***

On July 16, 2014, Becky Van Wyk, the Board's interim retirement administrator, recommended granting Rodriguez service-connected disability benefits based on Dr. Glidden's evaluation and a legal analysis prepared by county counsel. The Board denied the application pending a request for hearing from Rodriguez.

Rodriguez requested a hearing, which was held on August 7, 2015, before an agreed-upon hearing officer. After hearing witness testimony, and reviewing medical and personnel records, the hearing officer recommended approval of the service-connected disability application. Based on the hearing officer's proposed decision, Van Wyk recommended the Board approve the application, but also noted the Board could set the matter for a hearing before itself, in which it would decide the matter as if it had not been referred to the hearing officer.

The Board opted for the latter course and set the matter for hearing before itself, which ultimately was held on November 29, 2016. Rodriguez, Gilbert and Sanabria all testified. In addition, attorney Jeremy Lusk, who represented the County in Rodriguez's workers' compensation case and was responsible for sending a letter to Dr. House that

---

Further, this conclusion is not supported by the personnel, medical or psychiatric records provided. In addition[,] Dr. House did not make a diagnosis of Adjustment Disorder."

17.

explained his assignment, testified. Lusk explained workers' compensation law places the burden on the injured worker to show actual causes of employment were predominant as to all causes of the psychiatric injury and good-faith personnel actions are a defense on the issue of causation. A predominant cause is a threshold requirement of 50 percent or more causation; Rodriguez lost his workers' compensation case primarily because he did not meet the threshold requirement. Lusk understood the employment issues were not the predominant cause of Rodriguez's psychiatric claim.

Following the conclusion of the hearing, the parties submitted closing briefs. On February 1, 2017, the Board denied Rodriguez's application for a service-connected disability pension. The Board balanced Rodriguez's evidence, including his personal testimony and the expert medical testimony of Drs. Glidden and House, against the FCERA's evidence, including the testimony of Gilbert and Sanabria, and found Rodriguez's testimony was not credible and FCERA's evidence outweighed Rodriguez's evidence. The Board further found Rodriguez's "claimed incapacity was suspect" and he "failed to meet his burden of showing that such claimed incapacity was measurably related to his employment." In accordance with these factual findings, the Board found Rodriguez was not permanently incapacitated for the performance of his duties. Accordingly, the Board stated it "need not determine whether [Rodriguez]'s claimed incapacity is a result of injury or disease arising out of and in the course of his employment, or whether such employment contributed substantially to the claimed incapacity."

### The Petition for Administrative Mandamus

Rodriguez filed a petition for writ of mandate pursuant to Code of Civil Procedure[7] section 1094.5 in the superior court. Rodriguez alleged the Board abused its discretion in determining he was not entitled to a service-connected disability retirement

---

**7**  Undesignated statutory references are to the Code of Civil Procedure.

18.

because its decision was not supported by the weight of the evidence. Rodriguez also asked for attorney fees and costs pursuant to Government Code section 31536.

The parties agreed to a briefing schedule. In his opening brief, Rodriguez argued the evidence established he was permanently disabled from performing the essential duties of his job and workplace issues were a substantial cause of his disability. Rodriguez asked the trial court to issue a writ of mandate compelling the Board to grant him a service-connected disability retirement.

In opposition, the Board asserted the totality of the evidence supported the conclusion Rodriguez was not permanently incapacitated from his duties; therefore, the Board was correct in determining a service-connected disability should not issue. The Board contended the only issue before the court was whether the Board acted within its discretion when it found the weight of the evidence supporting a finding Rodriguez was not eligible for a service-connected disability retirement, i.e., that he was not permanently incapacitated due to factors caused by his employment, as a result of his claimed injury. The Board argued Rodriguez failed to meet his burden of proving the Board's findings were unsupported by the weight of the evidence, as he failed to prove: (1) he was permanently incapacitated for the performance of his duties; (2) his claimed permanent incapacity arose out of employment; and (3) his employment contributed substantially to the claimed incapacity.

Following oral argument on the petition, the trial court took the matter under submission and subsequently issued a written statement of decision and order granting the petition. The trial court first found Rodriguez met his burden of showing he was permanently incapacitated, as three medical professionals determined, based on their examinations or treatment of Rodriguez, he was permanently incapacitated from performing his job duties. On the question of whether his incapacity was service connected, the trial court explained that under the law it appeared even 10 percent employment causation was sufficient and it could not conclude Rodriguez's incapacity

19.

was not caused at least 10 percent by his employment.  Accordingly, the trial court found the weight of the evidence did not support the Board's decision and granted the writ.  The trial court directed the Board to grant Rodriguez a service-connected disability retirement.  The trial court declined to award attorney fees.

## DISCUSSION

### I. Standard of Review

When the trial court reviews an administrative decision pursuant to a petition for writ of mandate, it reviews the decision for abuse of discretion.  (§ 1094.5.)  "Abuse of discretion is established if … the order or decision is not supported by the findings, or the findings are not supported by the evidence."  (§ 1094.5, subd. (b).)  When the trial court is authorized to exercise its independent judgment in reviewing the administrative decision, "abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence."  (§ 1094.5, subd. (c).)  The trial court exercises its independent judgment upon the evidence when it reviews an administrative decision that substantially impacts a fundamental vested right.  (*Alberda v. Board of Retirement of Fresno County Employees' Retirement Assn.* (2013) 214 Cal.App.4th 426, 433 (*Alberda*).)  An administrative decision concerning a county employee's disability retirement impacts a fundamental vested right and requires independent review.  (*Ibid*; *Levingston v. Retirement Board* (1995) 38 Cal.App.4th 996, 1000 (*Levingston*).)

In carrying out its independent review, "the trial court must afford the agency's decision a strong presumption of correctness and must impose upon the petitioner the burden of showing that the agency's findings are contrary to the weight of the evidence, i.e., the decision was not supported by the preponderance of the evidence.  [Citations.]  An abuse of discretion is established if the trial court determines that the findings are not supported by the weight of the evidence."  (*Alberda*, *supra*, 214 Cal.App.4th at p. 433.)

" 'Because the trial court ultimately must exercise its own independent judgment, that court is free to substitute its own findings after first giving due respect to the

20.

agency's findings.' [Citations.] Thus, while the trial court begins its review with a presumption of the correctness of the administrative findings, the presumption is rebuttable and may be overcome by the evidence. [Citation.] 'When applying the independent judgment test, the trial court may reweigh the evidence and substitute its own findings for those of the [agency], after first giving due respect to the [agency]'s findings.' [Citation.] This includes examining the credibility of witnesses." (*Alberda*, *supra*, 214 Cal.App.4th at p. 433; see *Barber v. Long Beach Civil Service Com.* (1996) 45 Cal.App.4th 652, 658 ["[A]n exercise of independent judgment *does* permit (indeed, it requires) the trial court to reweigh the [administrative hearing] evidence by examining the credibility of witnesses."]; *Levingston*, *supra*, 38 Cal.App.4th at p. 1000 [trial court independently reviews the administrative record and may reweigh the evidence].)

"Our task is to determine whether substantial evidence in the administrative record supports the trial court's ruling [citation], except when the appellate issue is a pure question of law," such as whether the trial court applied the correct standard of review, which are reviewed de novo. (*Alberda*, *supra*, 214 Cal.App.4th at pp. 433–434.) Under this standard of review, we determine " ' "whether the evidence, viewed in the light most favorable to the respondent, sustains the findings of the trial court, resolving any reasonable doubts in favor of those findings." ' " (*Cameron v. Sacramento County Employees' Retirement System* (2016) 4 Cal.App.5th 1266, 1278.) "We may not reweigh the evidence and are bound by the trial court's credibility determinations." (*Estate of Young* (2008) 160 Cal.App.4th 62, 76.)

## II.     The CERL and the Presumption of Correctness

Under the County Employees Retirement Law of 1937 (CERL; Gov. Code, § 31450 et seq.), a county employee may be entitled to disability retirement benefits regardless of their age if they have become "permanently incapacitated" for the performance of their work duties as a result of injury or disease substantially arising out

of and in the course of their employment.  (Gov. Code, § 31720, subd. (a);**[8]** *Flethez v. San Bernardino County Employees Retirement Assn.* (2017) 2 Cal.5th 630, 635–636.)

The employee has the burden to prove his or her incapacity is both permanent and service connected.  (*Rau v. Sacramento County Retirement Board* (1966) 247 Cal.App.2d 234, 238; *Lindsay v. County of San Diego Retirement Board* (1964) 231 Cal.App.2d 156, 160–162.)  "Incapacity" means the substantial inability of the employee to perform his or her usual duties.  (*Mansperger v. Public Employees' Retirement System* (1970) 6 Cal.App.3d 873, 876 [interpreting "incapacity" under Gov. Code, § 21022].)  An employee's incapacity is service connected if there is a " 'real and measurable' connection" between the employee's job and his or her incapacitating condition.  (*Bowen v. Board of Retirement* (1986) 42 Cal.3d 572, 578 (*Bowen*).)  The condition must "permanently incapacitate[]" the employee "physically or mentally for the performance of his duties."  (Gov. Code, § 31724; see, e.g. *Valero v. Board of Retirement of Tulare County Employees' Assn.* (2012) 205 Cal.App.4th 960, 966–968 (*Valero*) [panic disorder may disable employee but was not service connected].)

Here, the Board was required to determine, by a preponderance of the evidence, whether there was substantial evidence Rodriguez was substantially unable to perform his usual duties and, if so, whether there was a real and measurable connection between his disability and his employment.  (*Bowen*, *supra*, 42 Cal.3d at pp. 578–579; *Glover v. Board of Retirement* (1989) 214 Cal.App.3d 1327, 1336–1337.)  The Board answered the first question, finding Rodriguez was not permanently incapacitated for the performance of his duties, and therefore did not determine whether his employment contributed substantially to the claimed incapacity.

---

**8**    Government Code section 31720, subdivision (a) provides:  "Any member permanently incapacitated for the performance of duty shall be retired for disability regardless of age if, and only if:  [¶] (a) The member's incapacity is a result of injury or disease arising out of and in the course of the member's employment, and such employment contributes substantially to such incapacity."

In the trial court, Rodriguez had the burden of proving the Board's decision was not supported by the weight of the evidence, i.e., the preponderance of the evidence. The trial court's duty in carrying out its independent review was to weigh the evidence, including the credibility of witnesses, and exercise its independent judgment on the facts, subject to the strong presumption of correctness of the Board's findings. (*Alberda*, *supra*, 214 Cal.App.4th at p. 433; *Breslin v. City and County of San Francisco* (2007) 146 Cal.App.4th 1064, 1077.) This means the trial court had to consider all the evidence and decide whether Rodriguez's presentation in the trial court sustained his burden of showing the weight of the evidence presented by both sides in the administrative hearing was contrary to the Board's findings.

In its statement of decision, the trial court recognized it was required to apply the independent judgment standard of review and recited the proper standard. The Board, however, contends the following language in the trial court's ruling shows it failed to apply the requisite strong presumption of correctness: (1) it began its analysis by stating "[a]t every step of the proceedings before the hearing before the Board on November 29, 2016, it was recommended to the Board to grant the application";[9] (2) after summarizing the opinions of Drs. Aziz, Glidden, and House, it noted Wyk, based on Dr. Glidden's

---

[9]     The Board asserts this statement is factually incorrect because county counsel advised the Board it could reject Wyk's recommendation and notify Rodriguez his application would be denied unless he requested a hearing. While county counsel did render such advice, it was in the context of answering the question of whether the Board may approve Wyk's recommendation to grant Rodriguez a service-connected disability retirement. County counsel answered that question in the affirmative, noting there was sufficient evidence to support approving the application without a hearing based on Dr. Glidden's findings. Alternatively, county counsel opined (1) there was evidentiary support for the Board to conditionally reject the application subject to receipt of additional evidence of disability; or (2) based on Dr. House's opinions and other evidence in Rodriguez's records, the Board could reject the recommendation and notify Rodriguez the application would be denied unless he requested a hearing. County counsel did not make a recommendation between the three courses of action; instead, county counsel concluded evidence existed to support any of the three options.

report, recommended granting Rodriguez service-connected disability benefits; and (3) it also noted the hearing officer "likewise concluded that [Rodriguez] met the requirements for a service-connected disability."

The Board contends reversal is required because these statements show the trial court failed to presume the correctness of the Board's findings, citing *Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 824. In our view, however, the trial court simply was recounting the history of the administrative proceedings and the fact the Board did not agree with the recommendations and conclusions others made.[10] While the trial court may have questioned the Board's finding given this history, its order does not show it did not at least implicitly begin with the presumption that the Board's finding Rodriguez was not incapacitated was correct and then determine the presumption was rebutted by the evidence, which led it to conclude the weight of the evidence favored Rodriguez. The trial court did so by noting three medical professionals had determined Rodriguez was permanently incapacitated from performing his job duties and accepting those opinions.

The Board's argument essentially is that the trial court's recitation of the history of the administrative proceeding, in which it noted the Board decided to deny the application despite recommendations from Wyk and the hearing officer to grant it, established the trial court did not start with the prescribed presumption. At worst, however, the trial court's decision is ambiguous regarding the standard it applied, which is fatal to the Board's claim on appeal. "[A] judgment is presumed correct, all intendments and presumptions are indulged in its favor, and ambiguities are resolved in favor of affirmance." (*Hirshfield v. Schwartz* (2001) 91 Cal.App.4th 749, 765–766, citing *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564; *Winograd v. American*

---

**10** For this reason, the Board's contention the trial court erroneously considered evidence that was not before the Board when determining whether the weight of the evidence supported the Board's decision is without merit. The statement of decision shows the trial court examined the evidence for itself and did not rely on these prior recommendations in reaching its decision.

24.

*Broadcasting Co.* (1998) 68 Cal.App.4th 624, 631.) Furthermore, "[i]t is a basic presumption indulged in by reviewing courts that the trial court is presumed to have known and applied the correct statutory and case law in the exercise of its official duties." (*People v. Mack* (1986) 178 Cal.App.3d 1026, 1032; accord, *People v. Coddington* (2000) 23 Cal.4th 529, 644, overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.) Accordingly, we presume the trial court accorded the Board's findings a presumption of correctness and imposed the burden on Rodriguez to prove the weight of the evidence did not support those findings.

## III. Permanent Incapacity

In determining whether Rodriguez met his burden of showing he was permanently incapacitated, the trial court noted Rodriguez claimed to be permanently disabled due to stress and major depression brought on by work, and stress, hostility, and retaliation in the work environment caused him to develop anxiety. The trial court explained "[t]hree medical professionals" determined, based on their examinations or treatment of Rodriguez, that he was permanently incapacitated from performing his job duties, and it could not "disregard the opinions of these professionals on this issue." The trial court determined the Board's argument on this issue, in which it discussed only facts related to the workplace affair and how it was handled in the workplace, was irrelevant to the question of whether Rodriguez was permanently incapacitated. Accordingly, the trial court found Rodriguez met his burden of showing he was permanently incapacitated.

Substantial evidence supports the trial court's finding of permanent incapacity. Dr. Glidden opined both that Rodriguez was disabled for the performance of his job duties and his incapacity was permanent. On the first point, Dr. Glidden explained that Rodriguez continued to experience psychologic and psychiatric symptoms which were exacerbated when contemplating a return to work. On the second point, he explained it had been more than three years since the initiation of stress stemming from a hostile work environment that began on October 4, 2009, and despite psychiatric treatment, Rodriguez

continued to experience symptoms of anxiety and depression which would make his return to work untenable. Dr. Glidden further noted Dr. Aziz, Rodriguez's psychiatrist, stated on July 10, 2012, that he would no longer be able to perform the functions of his current job.

In addition, Dr. Aziz opined in August 2012 that Rodriguez was not able to continue to perform his duties permanently.[11] In January 2013, Dr. Aziz opined Rodriguez was disabled due to major depression, his condition prevented him from returning to his usual and customary work, and he was disabled longer than previously estimated because he had shown minimal improvement in his depressive symptoms.

Thus, two medical professionals determined Rodriguez was permanently incapacitated from performing his job duties. As the Board points out, the third medical professional, Dr. House, did not opine Rodriguez was permanently incapacitated; based on this, the Board contends the trial court erred when it stated three medical professionals determined Rodriguez was permanently incapacitated. Even if the trial court was incorrect, however, a single medical opinion is enough to constitute substantial evidence, even if inconsistent with other medical opinions. (*Kyles v. Workers' Comp. Appeals Bd.* (1987) 195 Cal.App.3d 614, 621; *Curtis v. Board of Retirement* (1986) 177 Cal.App.3d 293, 298.)

In arguing the evidence is insufficient to support the trial court's finding Rodriguez was permanently incapacitated, the Board points out Rodriguez continued to perform his usual duties after the October 4 incident. While he claimed in his application for disability retirement that he could not perform his duties because he was "unable to

---

[11] While, as the Board points out, Dr. Aziz reported in December 2011 that Rodriguez's impairment was temporary, that was eight months before her report that he was permanently unable to perform his duties. Dr. Aziz confirmed Rodriguez's continued inability to perform his duties in January 2013, when she explained that Rodriguez was disabled longer than previously estimated due to his minimal improvement in depression symptoms.

concentrate," both Dr. Glidden and Dr. House respectively noted Rodriguez's ability to concentrate appeared to be within functional limits and he was able to complete the evaluation and testing without much difficulty.[12] The Board, however, misconstrues the substantial evidence standard of review, and essentially asks us to reweigh the evidence in the administrative record and reach a conclusion different from the trial court. Notably, while Dr. Glidden did observe Rodriguez's attention, ability to focus concentration, task persistence and tolerance for frustration appeared to be within functional limits, he also observed Rodriguez's "[c]ognitive tempo appeared slow, which Mr. Rodriguez had attributed to challenges with sustained concentration," and "his mood was constricted consistent with self-report and records reviewed." These later observations support Dr. Glidden's conclusions concerning permanent incapacity and the trial court's finding on that issue.

Noting the trial court stated it could not disregard the medical professionals' opinions, the Board asserts the trial court was not bound by their opinions, citing *Valero*, *supra*, 205 Cal.App.4th 960. In *Valero*, a hearing officer declined to accept the medical opinions contained in four medical reports and, based on the remaining evidence, found an applicant for a service-connected disability retirement failed to meet his burden of showing his employment was a substantial factor in bringing about his disability, a panic disorder. The retirement board accepted the hearing officer's recommendation and denied the application. The trial court denied the applicant's petition for administrative

---

**12** In his mental status examination, Dr. Glidden noted: Rodriguez's "[a]ttention and ability to focus concentration appeared to be within functional limits"; "[t]here was no evidence of relative inattention, distractibility, impulsivity or impersistence"; his "[t]ask persistence and tolerance for frustration appeared to be within functional limits"; his "[t]hought content was appropriate, cogent and directed, without evidence of associational disturbance"; and "[t]here was no evidence of deficits in learning, problem solving, judgment or insight." Dr. House noted: "Mr. Rodriguez does report some concentration difficulties and feels that he is distractible and has challenges in focusing his attention but he was able to proceed through the evaluation and arduous testing procedures without much difficulty."

27.

mandamus. The trial court determined the hearing officer properly rejected the medical opinions and concluded the applicant failed to meet his burden to show a real and measurable connection between his permanent psychiatric disability and his employment. (*Valero, supra,* 205 Cal.App.4th at pp. 962–963.)

On appeal, this court noted that to prevail on appeal, the applicant was required to show the evidence compelled a finding in his favor as a matter of law since he had the burden of proof on whether his disability was service connected. (*Valero*, *supra*, 205 Cal.App.4th at pp. 965–966.) We rejected the applicant's argument that because three doctors issued reports that could be interpreted as opining his panic disorder was substantially caused by his workplace experiences, and no doctor expressed a contrary opinion, the trier of fact was required to conclude there was a real and measurable connection between his job and his panic disorder. (*Id.* at pp. 966–967.) We noted the trial court found the reports were not persuasive because they were based on the applicant's "undocumented and uncorroborated self-reporting about the cause of his panic attacks" and his "self-reports were not credible," and explained a trier of fact reasonably could have reached this conclusion based on evidence that reasonably could have been deemed to render the doctors' reports less than persuasive. (*Id.* at p. 967.) Accordingly, we concluded this was not a case where the undisputed facts led to only one conclusion; therefore, there was substantial support for the trial court's order. (*Id.* at p. 968.)

*Valero* shows that a trier of fact may reject an expert's opinion if it is based on evidence that it determines is not credible. The case does not hold, as the Board suggests, that "undocumented and uncorroborated self-reporting" does not, in and of itself, rise to the level of substantial evidence. Instead, the trier of fact may look at other evidence and determine the credibility of the self-reports. Thus, while the trial court here could have found Rodriguez not credible and rejected the opinions of Drs. Aziz and Glidden, it did

28.

not do so.  Instead, the trial court impliedly found Rodriguez credible when it found it could not disregard these medical professionals' opinions.

In sum, substantial evidence supports the trial court's finding that Rodriguez met his burden of showing he was permanently incapacitated.

## IV. Service-connected Incapacity

Even if "permanently incapacitated for the performance of duty," to qualify for a disability retirement, the applicant's incapacity must be the result of injury or disease arising out of and in the course of the applicant's employment which "contributes substantially to such incapacity."  (Gov. Code, § 31720, subd. (a).)  For an applicant's employment to contribute substantially, there must be "substantial evidence of a real and measurable connection between an employee's disability and his employment." (*Hoffman v. Board of Retirement* (1986) 42 Cal.3d 590, 593.)  While "employment-related stress may be a very small part of the disability," it must be more than "*infinitesimal and inconsequential*" in order for it to be "real and measurable evidence" the "incapacity was a result of injury or disease arising out of and in the course of the employment."  (*DePuy v. Board of Retirement* (1978) 87 Cal.App.3d 392, 398–399.)  Thus, "while the causal connection between the stress and the disability may be a small part of the causal factors, it must nevertheless be real and measurable."  (*Id.* at p. 399.)  Medical testimony placing causation somewhere between 10 and 60 percent has been found to meet the "small part" test of *DePuy*.  (*Lundak v. Board of Retirement* (1983) 142 Cal.App.3d 1040, 1045.)  In *Bowen,* our Supreme Court rejected the contention that greater than 50 percent industrial causation is required, approving of *Lundak* and *DePuy*. (*Bowen, supra,* 42 Cal.3d at pp. 577–579.)

Based on these authorities, the trial court concluded Rodriguez's incapacity was caused at least 10 percent by his employment.  The trial court noted Dr. Glidden opined Rodriguez's incapacity arose out of his employment.  In addition, Rodriguez told Dr. House he felt his performance was unfairly and inappropriately evaluated and

criticized, and he lacked support and appreciation from his supervisors, and Dr. House agreed Rodriguez's workplace problems caused 35 to 40 percent of his disability. The trial court also noted the testimony at the administrative hearing, in which Rodriguez stated he complained of constant, daily harassing and nitpicking by his supervisors, which resulted in depression, lack of concentration and bad memory, and every time he met with Sanabria, she had something negative to say about him. Rodriguez dreaded meeting with her and trying to correct his work because it was never satisfactory, and it got to the point where he dreaded going to work and could not function. Gilbert testified DCSS instituted changes in the way workload was addressed, and Rodriguez was falling below DCSS's expectations, but neither Gilbert nor Sanabria testified Rodriguez's work was not frequently corrected or criticized, as he claimed.

### A.    The Trial Court's Jurisdiction

We first address the Board's contention the trial court exceeded its jurisdiction when it decided this issue, as it was without authority to direct the Board to issue Rodriguez a service-connected disability retirement. The Board argues that because it did not decide the issue of whether Rodriguez's claimed incapacity was service connected, once the trial court found Rodriguez was permanently incapacitated, it was required to remand the matter to the Board so it could consider the issue. The Board asserts that by deciding this issue, the trial court limited the discretion vested in it, contrary to the mandates of section 1094.5, subdivision (f).[13]

Rodriguez contends the Board waived this issue because it did not raise the issue in the trial court. Rodriguez points out that while both he and the Board briefed the issue

---

[13]    Section 1094.5, subdivision (f) provides: "The court shall enter judgment either commanding respondent to set aside the order or decision, or denying the writ. Where the judgment commands that the order or decision be set aside, it may order the reconsideration of the case in light of the court's opinion and judgment and may order respondent to take such further action as is specially enjoined upon it by law, but the judgment shall not limit or control in any way the discretion legally vested in the respondent."

of permanent incapacity and whether that incapacity was service connected, the Board never argued the trial court's review should be restricted only to the issue of incapacity or the matter remanded to it. The Board disputes this, asserting it raised the issue in its opposition brief before the trial court. In the cited section of the brief, however, the Board argues about the standard of review, asserting the trial court is required to give "a strong presumption of correctness to the Board's findings of fact" and "determine whether or not the Board abused its discretion in making its determination." The Board further argues that under "the correct statement of the issue," namely, whether "the Board act[ed] within its discretion when it denied [Rodriguez]'s [] retirement application based on the entirety of the record before it," the trial court "is not to conduct a trial de novo" and instead "must review the Board's decision for abuse of discretion." Nowhere in the opposition brief does the Board state the trial court's review is limited to whether Rodriguez is permanently incapacitated, or assert the trial court should not decide the issue of service connectedness and instead remand the matter to the Board.[14]

While "[t]he failure to raise an issue in the trial court in a writ proceeding waives the issue on appeal," the waiver doctrine does not apply if the issue involves a pure question of law on undisputed facts. (*Fox v. State Personnel Bd.* (1996) 49 Cal.App.4th 1034, 1039.) Here, the issue of whether the trial court had the authority to decide whether Rodriguez's incapacity was service connected is one of law; therefore, the waiver doctrine does not apply.

---

**14** Notably, in the introduction the Board states "[t]he only issue presented herein is whether the Board acted within its direction when it found the weight of the evidence supported a finding that [Rodriguez] is not eligible for a service-connected disability ("SCD") retirement (e.g., not permanently incapacitated due to factors caused by his employment) as a result of his claimed injury." Consistent with this statement the Board states in the argument section the legal standard is broken down into three questions— whether Rodriguez has a permanent incapacity which is the result of injury; if so, does the incapacity arise out of and in the course of his employment; and if so, did his employment contribute substantially to such incapacity. The Board then argues Rodriguez failed to prove any of these elements.

31.

Where, as here, the reviewing court independently reviews the administrative record, the trial court may reweigh the evidence and make its own factual findings. (*Levingston*, *supra*, 38 Cal.App.4th at p. 1000.) The "powers of independent review would be meaningless if the trial court were then required to return the matter to the administrative agency for retrial and redecision. As [the applicant] points out, the process could go on forever." (*Ibid.*)

Here, Rodriguez had a full evidentiary hearing before the Board, in which he presented evidence on, and argued, both issues—incapacity and service connectedness. While the Board stated it need not determine the second issue because it found Rodriguez was not incapacitated for the performance of his duties, it made a factual finding that Rodriguez "failed to meet his burden of showing that such claimed incapacity was measurably related to his employment." Thus, the Board in fact decided the service connection issue adversely to Rodriguez, even though its decision to deny his application was not made on that basis. Having made the factual finding, however, under the independent judgment standard, the trial court could reweigh the evidence and make its own finding. While "mandamus cannot control the lawful exercise of discretion by the agency," the trial court, in evaluating the evidence offered at the administrative hearing in its exercise of its independent judgment, could make findings and direct the Board to award Rodriguez a disability retirement. (*Levingston*, *supra*, 38 Cal.App.4th at p. 1001.)

**B.     *Substantial Evidence of Service Connection***

The Board contends the trial court's findings are not supported by substantial evidence, pointing to evidence that would support findings that Rodriguez's claimed disability did not arise out of and in the course of his employment and his employment did not contribute substantially to his incapacity. The Board asserts Rodriguez's claimed disability arose out of his extra-marital affair and the fallout from it, not his employment, as shown by Rodriguez repeatedly tying his disability to the October 4, 2009 incident in his application and reports to the medical providers. The Board points to other non-

32.

work-related stressors it claims contributed to his disability and points out Rodriguez himself identified his disability as non-work related on his leave of absence forms. Finally, the Board asserts Rodriguez's disability could not have arisen from poor performance evaluations, which were satisfactory, or any disciplinary or adverse employment action, since none were taken against him.

In making this argument, however, the Board is asking us to reweigh the evidence, which we are not permitted to do. We do not determine whether substantial evidence would have supported a contrary finding, but only whether substantial evidence supports the finding the trial court actually made. (*Norasingh v. Lightbourne* (2014) 229 Cal.App.4th 740, 753.) On this record, we conclude there is substantial evidence to support the trial court's finding that there was a real and measurable connection between Rodriguez's disability and his employment. First, Dr. Glidden opined, based on Rodriguez's self-reporting as well as his medical and personnel records, that Rodriguez's incapacity arose out of his employment. Dr. Glidden found Rodriguez's symptoms did not stem from a preexisting disorder, but rather arose from employment-related circumstances, namely, the criticism he received from his supervisors which escalated from the date of the incident until he left employment.

Rodriguez made similar complaints to Dr. House during his examination, telling him he began having problems with his supervisors after the affair was revealed and he felt he was under increasing scrutiny about his supervisory style and performance. Dr. House agreed "workplace issues at least caused 35 to 40 percent" of Rodriguez's disability and the events Rodriguez told him about were a combination of nonindustrial events, which included his personal relationships, coupled with "direct, substantial workplace problems he was having."[15] Moreover, Rodriguez testified at the

---

[15] While the Board asserts it is not clear what Dr. House understood to be "workplace issues," as that term may have encompassed the affair and personal fallout from it, Dr. House's later response shows he separated Rodriguez's personal relationships from his workplace problems, such as criticism from supervisors. Even the Board

administrative hearing his supervisors were constantly harassing and criticizing him, which resulted in depression, lack of concentration and a bad memory. He said he dreaded going to work because he felt he never did anything right and did what they told him, and it got to where he could not function. Gilbert and Sanabria essentially confirmed Rodriguez was placed under increased scrutiny; neither of them disputed that Rodriguez's work was not frequently corrected or criticized as he claimed.

Based on this evidence, the trial court reasonably could conclude Rodriguez's major depression arose out of and in the course of his employment, which substantially contributed to Rodriguez's incapacity. Citing *Valero*, the Board points out it was not required to conclude there was a real and measurable connection between Rodriguez's job and his claimed injury because the doctors' reports were based on Rodriguez's self-reporting and it determined Rodriguez was not credible. The Board asserts the trial court failed to give proper deference to its determination of Rodriguez's credibility, especially since the trial court did not make a contrary credibility finding.

The trial court, however, impliedly found Rodriguez credible on the issue of service connection when it accepted his testimony in determining Rodriguez's incapacity was caused at least 10 percent by his employment. (See *Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 48 [if a party fails to bring ambiguities or omissions in the statement of decision's factual findings to the trial court's attention, the reviewing court infers the trial court made every implied factual finding necessary to uphold its decision].) The trial court's disagreement with the Board's credibility determination does not, in and of itself, establish the trial court did not start with the prescribed presumption of correctness. If that were the case, independent review would be an illusion. As we have already explained, in the absence of an explicit indication the

_____

understood this to be the case, as it stated in its opposition brief in the trial court that Dr. House testified Rodriguez's "employment may have contributed 35 to 40 percent of this stress."

34.

trial court did not apply the appropriate deference, we presume the trial court accorded the Board's findings a presumption of correctness.

The Board seems to believe that because it had the sole opportunity to assess Rodriguez's demeanor and credibility under oath, the trial court must accept its credibility finding. However, "an exercise of independent judgment *does* permit (indeed, it requires) the trial court to reweigh the [administrative hearing] evidence by examining the credibility of witnesses." (*Barber v. Long Beach Civil Service Com.*, *supra*, 45 Cal.App.4th at p. 658 [" 'the trial court has the power and responsibility to weigh the evidence at the administrative hearing *and to make its own determination of the credibility of witnesses*' "].) " '[B]y reason of the importance of rights generally affected by administrative adjudications subject to the independent judgment test of review, California fixes responsibility for factual determination at the trial court rather than the administrative agency tier of the pyramid as a matter of public policy.' " (*Id.* at p. 659.)

Thus, it was for the trial court to determine Rodriguez's credibility, which it did when it impliedly found him credible. The Board asserts the allegations of service-connection are refuted by other evidence that casts doubt on Rodriguez's credibility, such as: the fact he did not receive any adverse employment actions or performance evaluations; his performance evaluations were favorable; he did not lodge any grievance or discrimination complaints; he characterized his leave as non-work related on the leave of absence forms; and the fact he tied his injury to the October 4 incident. But none of this evidence directly refutes Rodriguez's claim he was subjected to constant criticism about his work performance that, over time, caused him to not be able to function. Moreover, we defer to the trial court on issues of credibility because it is the trial court's exclusive province to determine the credibility of a witness. (*Lenk v. Total-Western, Inc.* (2001) 89 Cal.App.4th 959, 968 [" '[N]either conflicts in the evidence nor " 'testimony which is subject to justifiable suspicion … justif[ies] the reversal of a judgment [or order], for it is the exclusive province of the [trier of fact] to determine the credibility of a

witness and the truth or falsity of the facts upon which a determination depends.' " ' "].)
We may reject testimony only when it is inherently improbable or incredible. (*Ibid.*)

The Board is essentially seeking to relitigate the facts on appeal. However, the role of a factfinder belongs to the trial court, not to the appellate court. (*In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 493–494.) Where the trial court has weighed the credibility of witnesses, the appellate court "cannot make a new determination as to which witnesses were most worthy of belief" (*Blue v. Watson* (1957) 147 Cal.App.2d 582, 590), nor may we express a preference in conflicting testimony, inferences, or theories (*Whitcomb v. Emerson* (1941) 46 Cal.App.2d 263, 270).

Finally, the Board argues public policy weighs heavily in favor of overturning the trial court's decision. The Board asserts allowing Rodriguez "to parlay the repercussions of his extra-marital affair into a service-connected disability retirement will send an unfortunate message to public retirement systems throughout the state and to their employees," and if we sanction such rewards, we will greatly undermine the public trust in these systems. While we are sympathetic to the Board's concerns and certainly do not sanction awarding a service-connected disability retirement based solely on repercussions of an extra-marital affair, we are constrained by the findings of the trial court, supported by substantial evidence, even though we might have decided the case otherwise in the role of the trial judge.

## V.    Attorney Fees

Rodriguez asks us to award his attorney fees and costs incurred as result of this appeal, citing Government Code section 31536, which provides in relevant part: "If a superior court reverses the denial by the board of an application for a retirement allowance …, the superior court in its discretion may award reasonable attorney's fees as costs to the member … who successfully appealed the denial of such application…." Government Code section 31536 vests the trial court with discretion to award attorney fees. (*County of Marin Assn. of Firefighters v. Marin County Employees Retirement*

*Assn.* (1994) 30 Cal.App.4th 1638, 1654.)  Where a lower court awards attorney fees under this statute, those fees include attorney fees incurred on appeal.  (*Morcos v. Board of Retirement* (1990) 51 Cal.3d 924, 929–930 ["since attorney fees are properly recoverable in the trial court for petitioner's success there, they should be recoverable for his continued success on appeal"].)

Here, the trial court, in the exercise of its discretion, declined to award attorney fees to Rodriguez.  Rodriguez concedes he did not appeal that decision and is not challenging it, but he nevertheless asks us to exercise our discretion to award attorney fees on appeal.  He argues we should do so because the Board has not presented any judicial error and only challenged the trial court's decision because it did not want him to "receive his entitlement."  Even if we have discretion under the statute to award attorney fees when the trial court declined to do so, which is not clear, we decline to exercise it here, as it does not appear to us that the Board appealed only for the purposes of delay.

## DISPOSITION

The order is affirmed.  The parties shall bear their own costs on appeal.


                                                                    DE SANTOS, J.

WE CONCUR:


PEÑA, Acting P.J.


SMITH, J.

37.